# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **RICHARD A. FIGUEROA**, | |
| Plaintiff, | |
| v. | Case No. 16-cv-649 (CRC) |
| **REX TILLERSON**, *Secretary, U.S. Department of State*,[1] | |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiff Richard Figueroa climbed the ranks of the Foreign Service for 23 years. But in 2009, after he did not receive one of a limited number of competitively-awarded promotions to the next level, Figueroa was forced into mandatory retirement and filed suit, alleging that the State Department denied him the promotion because he is Hispanic. Proceeding pro se, he advances claims under Title VII of the Civil Rights Act for both disparate treatment and disparate impact. For supporting evidence, Figueroa does not point to any intentional discrimination against him personally. He relies instead on the historical lack of diversity among Foreign Service Officers and the purported unconscious bias of the State Department promotion board that judged him less qualified than other candidates.

With discovery complete, both parties have moved for summary judgment. Finding that Figueroa has presented insufficient evidence to rebut the Department's legitimate, nondiscriminatory reason for denying him the promotion—that Figueroa was not ranked highly enough in the Department's competitive selection process—and that the statistics Figueroa offers

---

[1] Secretary Tillerson, as former Secretary Kerry's successor, has been automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

on Hispanic promotion rates do not establish a prima facie case of disparate impact, the Court will grant the Department's motion and deny Figueroa's.

## I. Background

### A. Promotions within the Foreign Service

The Department of State includes members of the Foreign Service, who "advocate American foreign policy, protect American citizens, and promote American interests throughout the world." Shea v. Kerry, 796 F.3d 42, 46 (D.C. Cir. 2015) (citation omitted). Members of the Foreign Service are appointed by the President or the Secretary of State. 22 U.S.C. §§ 3942–43. Upon appointment, a member of the Foreign Service is initially assigned to an appropriate salary class. Id. § 3964. These classes are denominated FS-06 to FS-01, in ascending order of seniority. See Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s MSJ") Ex. A ("Report of Investigation"), at 132. Above the FS-01 level is the "Senior Foreign Service" level. See id. at 145–46.

Promotion into the more senior ranks of the Foreign Service, such as level FS-01, occurs through a competitive promotion process. Each year, the Department's Regional Management Analysis office determines how many promotions are available based on how many people are retiring, resigning, or being promoted to a higher level. Def.'s MSJ Ex. D ("Pierangelo Dep."), at 99:22–101:1. The number of open promotions thus varies from year to year depending on the specific personnel movements in any particular year. Id. at 101:6–12.

The competitive process that determines which of the eligible employees should receive one of the limited promotion slots is laid out in what the Department refers to as the "precepts." Id. at 76:19–20. The precepts consist of two main documents that detail this competitive process. Id. The first document explains the procedures for evaluating eligible employees and

making promotion decisions and is the product of collective bargaining negotiations between the Department and the American Foreign Services Association, the labor union that represents Foreign Service officers.  Id. at 77:8–17.  The procedures detail how the selection boards that evaluate eligible employees are organized, what the boards should consider when evaluating employees, and how the boards will proceed towards their decision.  Id.  The second document sets out the "core precepts," which are six areas of competence that the selection boards use to guide their evaluation of the eligible employees for promotion.  Id. at 76:20–77:7.

Based on the record, the promotion evaluation process works as follows.  After determining which employees are eligible for promotion—usually based on a requirement for a minimum number of years at the current level—two selection boards review each employee.  Id. at 79:4–5.  One of these boards is a "classwide" selection board that reviews all of the employees at a particular level (e.g., all FS-02 employees).  Id. at 79:11–18.  The classwide board has two reviewing groups, a preliminary board and a secondary board.  Id. at 79:4–18; Report of Investigation at 153 (precepts documents).  In addition to the classwide board, every employee is also reviewed by a second "conal" board that solely considers the employees at a particular rank that are assigned to a specific functional division (or "cone") of the Foreign Service.  Pierangelo Dep. at 79:4–10; Report of Investigation at 154.

Employees are first reviewed by the preliminary classwide board.  Pierangelo Dep. at 95:10–19.  The preliminary classwide board selects 35-50% of the employees to advance to the secondary classwide board.  Id. at 95:19; Report of Investigation at 153 (precepts documents).  The secondary classwide board then reviews each employee and each board member individually determines whether that employee should be recommended for promotion.  Pierangelo Dep. at 95:20–96:4; Report of Investigation at 153–54, 190–91 (precepts documents).  For all employees

who receive a certain minimum number of recommendations, the secondary classwide board ranks the employees in the order it believes they should be promoted. Pierangelo Dep. at 96:2–3. Based on that ranking, employees are promoted according to the number of open spots available for the classwide review process: for instance, if there are fifteen open spots for classwide review, then only the first fifteen ranked employees receive promotions. Id. at 98:19–99:2.

Once the classwide board has completed its review, any employee who did not receive a promotion is reconsidered by the conal board. Id. at 97:13–98:1, 99:2–8. The conal board reviews each employee afresh, and does not receive any ranking that the classwide board previously assigned to the employee. Id. at 99:4–8. As with the secondary classwide board, each conal board member individually determines which employees should be recommended for promotion and then the board as a group rank-orders the employees who receive the required minimum number of recommendations. Id. at 98:3–7. At the end of the process, employees are promoted based on their ranking and the number of open spots for promotion from the conal board review.

In addition to making promotion recommendations, the selection boards also determine whether employees should be "low-ranked." Id. at 22:15–21; Report of Investigation at 137–38 (precepts document). A low ranking is an indication that the employee is deficient in some needed skill or performance area. Pierangelo Dep. at 22:15–21; Report of Investigation at 137–38. For each low-ranked employee, the selection board that made that ranking prepares a statement explaining the basis for its decision. Report of Investigation at 138–39. Any employee that is neither low-ranked nor numerically-ranked for promotion—which encompasses the majority of the eligible employees every year—is considered "mid-ranked." Pierangelo Dep. at 23:6–11. Every year, the selection boards undertake a fresh review of the eligible employees

without being bound by the rankings—low, mid, or numerical—of the prior year's boards.  Id. at 25:15–16.

To evaluate the eligible employees, the review boards are given the employee's performance file, which contains the evaluations, training forms, awards, and commendation letters that the employee has received in her career.  Id. at 104:14–19; Report of Investigation at 142 (precepts document).  The boards also receive an abbreviated employee profile, which contains the employee's name, current grade, assignment history, language proficiencies, and promotion history.  Pierangelo Dep. at 104:20–105:7; Report of Investigation at 142 (precepts document).  The selection boards do not receive any information on an employee's race or ethnicity, except to the extent it can be gleaned from the employee's name.  Pierangelo Dep. at 105:8–12.  Selection board members are instructed to base their decision solely on the information contained in the employee file.  Report of Investigation at 142 (precepts document). In addition, they receive equal employment opportunity training prior to conducting their review. Report of Investigation at 89 (Declaration of selection board member Susan Alexander); id. at 98 (Declaration of selection board member Marian Williams); id. at 108 (Declaration of selection board member David Donahue); id. at 113 (Declaration of selection board member Geeta Pasi).

In evaluating the eligible employees, the selection boards focus on the six core precepts: (1) leadership skills, (2) managerial skills, (3) interpersonal skills, (4) communication and foreign language skills, (5) intellectual skills, and (6) substantive knowledge.  Report of Investigation at 118–26 (precepts decision criteria).  A chart created by the Department and the labor union provides detailed descriptions of each of these precepts by listing specific skills within each one—for instance, "innovation" and "teamwork" are skills within the precept "leadership skills" and "job information" and "technical skills" are skills within the precept

"substantive knowledge." Id. at 119, 125. The chart further defines what a low-, mid-, or senior-level employee's mastery of each skill should entail. Id. at 118–26. For instance, the chart describes a senior-level employee in the skill "operational effectiveness" under the precept "managerial skills" as one who "[e]stablishes effective management procedures and controls; encourages and rewards efforts of staff to enhance their effectiveness . . . [and] foresees challenges to, and opportunities for, the organization and takes steps in advance to deal with them." Id. at 120. Similarly, a senior-level employee in the skill "oral communication" for the precept "communication and foreign language skills" is one who "[e]ffectively argues complex policy issues [and] deals comfortably with the most senior levels of government and society." Id. at 123.

The six core precepts that the selection boards use to evaluate employees for promotion are the same skills used to evaluate employees in their annual evaluations. Id. at 205 (Figueroa's 2008 evaluation); id. at 210 (Figueroa's 2007 evaluation); id. at 216 (Figueroa's 2006 evaluation). In these annual evaluations, the reviewers are instructed to address the employee's performance and potential for advancement in each of the six core precepts, using specific examples. Id. at 205, 210, 216. The reviewer is explicitly directed to the core precepts—the same chart that the selection boards have—for the definitions of each competency. Id. at 205, 210, 216. When the selection boards evaluate employees, they receive copies of each of these performance reviews as part of the employee's performance file. Id. at 142 (precepts document); see also Pierangelo Dep. at 104:14–19. Essentially, then, the competitive-promotion process is designed to dovetail with the Department's annual performance-evaluation process.

Historically, the Department has faced criticisms regarding a lack of racial diversity in the Foreign Service ranks. See, e.g., Shea, 796 F.3d at 47. In 1985, Congress enacted legislation

6

directing the Department to create "a plan designed to increase significantly the number of members of minority groups" in the Foreign Service. Id. (citation omitted). Two years later, Congress again admonished the Department to increase its efforts to ensure diversity in the Foreign Service. Id. The Department subsequently adopted an affirmative action plan, which the D.C. Circuit upheld against a challenge of reverse discrimination. See id. at 65. Still, concerns over the lack of minority representation in the highest levels of the Foreign Service persist to this day. See, e.g., Pl.'s Mot. Summ. J. ("Pl.'s MSJ") Ex. RAF-21 (letters from members of Congress dated March 2016).

    B.  Factual and Procedural History

    Richard Figueroa, a Hispanic man born in Puerto Rico, began working at the Department of State in March of 1986 in the political cone. Def.'s MSJ Ex. B ("Figueroa Dep."), at 6:3–4. Figueroa was first appointed at the FS-05 level, serving overseas with an initial assignment in Madrid, Spain. Id. at 6:10–11. He was administratively promoted from FS-05 to FS-04 in 1988, and by 1997 had been promoted up to the FS-02 level. Id. at 6:16–25.

    Figueroa was first eligible to be promoted to the FS-01 level in 2000, but he was low-ranked by the selection boards in both 2000 and 2001. Id. at 25:20–26:2. He was then mid-ranked the next two years, in 2002 and 2003. Pierangelo Dep. at 128:20–129:2, 130:11–13. In 2004, Figueroa was recommended for promotion and ranked 79 out the 87 employees eligible that year. Id. at 130:20–131:2. But he ultimately did not receive a promotion because only 43 promotions were awarded in 2004. See Def.'s MSJ Ex. F, at DOS001043. Similarly, in 2005 Figueroa was recommended for promotion, this time ranked 118 out of 141. Pierangelo Dep. at 131:22–132:3. Again, though, Figueroa did not receive a promotion because only 39 promotions were awarded that year. See Def.'s MSJ Ex. F, at DOS001043. In 2006, 2007, 2008, and 2009,

Figueroa was again mid-ranked. Pierangelo Dep. at 132:5–133:8. Figueroa retired from the

Foreign Service in 2009 at the FS-02 level pursuant to Department regulations that require

employees who do not receive a promotion within a certain number of years to retire from the

Foreign Service. Figueroa Dep. at 82:13.

On October 20, 2008, following the 2008 promotion process where he was ultimately

mid-ranked, Figueroa met with an Equal Employment Opportunity Counselor at the Department.

Report of Investigation at 18. At this meeting, Figueroa alleged that the Department had

discriminated against him because of his Hispanic race when it failed to promote him to the FS-

01 level. Id. at 19. He also alleged that the Department systemically discriminated against

Hispanics in the promotion and retention of Foreign Service officers and sought a retroactive

promotion to the FS-01 level as of 2003 as well as for the Department to "improve its system for

promoting and retaining minorities especially Hispanics." Id. at 19–20.

Figueroa then filed a formal complaint of discrimination with the Department's Office of

Civil Rights on November 26, 2008. Id. at 14.[2] After an investigation, the Department issued a

Final Agency Decision on August 15, 2013, concluding that Figueroa had not prevailed on his

claim of discrimination on the basis of race. Def.'s Reply Supp. Mot. Summ J. & Opp'n Pl.'s

Cross-Mot. Summ. J. ("Def.'s Reply") Ex. 1 ("Final Agency Decision"), at 15. The Final

Agency Decision concluded that Figueroa had made out a prima facie case of disparate

treatment, though not of disparate impact. Id. at 13–14. However, the Final Agency Decision

found that the Department had brought forth a legitimate, nondiscriminatory reason for

---

[2] Figueroa also filed a class complaint, which was dismissed by the Equal Employment Opportunity Commission. See Report of Investigation at 52. This claim is not at issue here because Figueroa has never sought to certify this case as a class action.

Figueroa's non-promotion, namely that "it applied the same criteria to consideration of [Figueroa's] promotion candidacy that it applied to all others." Id. at 14. Since Figueroa failed to present evidence of pretext, the Final Agency Decision rejected his claim of discrimination. Id. at 14–15. Figueroa appealed this decision to the Equal Employment Opportunity Commission ("EEOC"), which affirmed on March 1, 2016. Compl. Ex. 2, at 6–7.

The following month, Figueroa filed suit in this Court against the Department of State. His complaint contends that the Department violated Title VII of the Civil Rights Act of 1964 by discriminating on the basis of national origin in the denial of his promotion from FS-02 to FS-01 in 2008. Compl. ¶ 1. He requests reinstatement in the Foreign Service as well as back pay. Id. ¶ 16. The Department filed an answer, and the parties underwent discovery. Now that discovery has concluded, both parties have moved for summary judgment.

## II. Legal Standard

Summary judgment is appropriately granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" if the resolution "might affect the outcome of the suit under the governing law" and "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, the Court must "'examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to' the nonmoving party." Robinson v. Pezzat, 818 F.3d 1, 8 (D.C. Cir. 2016) (citation omitted).

Title VII of the Civil Rights Act requires that personnel decisions by the federal government be made free from discrimination on the basis of race. 42 U.S.C. § 2000e-16(a).

This prohibition encompasses "both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." Ricci v. DeStefano, 557 U.S. 557, 577 (2009).

To make out a case for disparate treatment—that is, intentional discrimination—on the basis of race, a plaintiff bears the initial burden of showing that she suffered an adverse employment action because of her race. See, e.g., Brady v. Office of Sergeant at Arms, 520 F. 3d 490, 493 (D.C. Cir. 2008). When there is no direct evidence of discrimination, the Court applies the McDonnell Douglass burden-shifting framework. Hairston v. Vance-Cooks, 773 F.3d 266, 272 (D.C. Cir. 2014). Under this framework, the plaintiff bears the burden of establishing a prima facie case of discrimination. Id. If the plaintiff can make out a prima facie case, then the burden of production shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for the adverse action. Id. Should the defendant do so, the burden once more shifts back to the plaintiff to bring forth evidence that this reason is not the true reason, but rather a pretext for discrimination. Id.

Since this case is at summary judgment and the Department has argued that it had a legitimate, nondiscriminatory reason for its action, the Court does not look to whether a prima facie case has been made. See id. Instead, the Court simply determines if the Department has in fact proffered a legitimate, nondiscriminatory reason and, if so, whether the plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race." Id. (quoting Brady, 520 F.3d at 494). This "requires more than simply criticizing the employer's decisionmaking process." Id.

In contrast, evidence of discriminatory intent or illicit motive is not required to make out a claim for disparate impact.  <u>Segar v. Smith</u>, 738 F.2d 1249, 1266 (D.C. Cir. 1984).  Rather, "a plaintiff must generally 'demonstrate with statistical evidence that the [challenged] practice or policy has an adverse effect on the protected group.'"  <u>Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.</u>, 639 F.3d 1078, 1086 (D.C. Cir. 2011) (citation omitted).  If the plaintiff meets that burden, then the burden shifts to the defendant "to 'demonstrate that the challenged practice is job related for the position in question and consistent with business necessity.'"  <u>Anderson v. Zubieta</u>, 180 F.3d 329, 339 (D.C. Cir. 1999) (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)).  Should that burden be met, the plaintiff must then "demonstrate that an alternative employment practice could meet the employer's legitimate needs without a similar discriminatory effect."  <u>Id.</u>

### III.  Analysis

Figueroa has raised two claims related to his non-promotion, one for disparate treatment and the other for disparate impact.  The Department requests summary judgment on both.

#### A.  <u>Disparate Treatment</u>

Figueroa first raises a disparate treatment claim:  he was not promoted in 2008 because he is Hispanic.  <u>See</u> Compl. ¶ 1.  The Department responds that it had a legitimate, nondiscriminatory reason for its decision not to promote Figueroa.  Def.'s MSJ at 9.  The Court thus faces two questions:  (1) has the Department proffered a legitimate, nondiscriminatory reason for its actions and, if so, (2) has Figueroa set forth sufficient evidence on which a jury could conclude the Department's proffered reason is pretext for racial discrimination?

*1. The Department's legitimate, nondiscriminatory reason*

The Department argues that it has provided a legitimate, nondiscriminatory reason for

Figueroa's non-selection:  it applied the standard criteria in the precepts pursuant to the process

detailed there and Figueroa was not ranked highly enough by the selection boards to receive one

of the limited promotion slots (and, by inference, was not as qualified as those who were

promoted).  Def.'s MSJ at 9–10.  This reason—the decision to choose a more qualified

individual over the plaintiff—has been recognized by the D.C. Circuit as a legitimate,

nondiscriminatory reason.  See, e.g., Adeyemi v. District of Columbia, 525 F.3d 1222, 1227–28

(D.C. Cir. 2008) (employer asserted legitimate, non-discriminatory reason for not hiring

candidate ranked lower than hired employees in list of applicants); Holcomb v. Powell, 433 F.3d

889, 896 (D.C. Cir. 2006) (employer asserted legitimate, nondiscriminatory reason when it stated

it hired the "better" and "more qualified" applicant).  And at least one court in this District has

accepted an insufficient ranking in the Foreign Service competitive promotion process as a

legitimate, non-discriminatory reason for a decision not to promote, albeit without analysis.  See

Bolden v. Clinton, 847 F. Supp. 2d 28, 35 (D.D.C. 2012).  At first blush, then, the Department

has proffered a legitimate, nondiscriminatory reason for Figueroa's non-selection.

Figueroa nonetheless challenges the sufficiency and legitimacy of this reason.  He first

contends that the Department has failed to produce sufficient evidence for its proffered reason.

But the Department has.  It has provided affidavits from members of the 2008 selection boards

stating that they reviewed each employee's personnel file in accordance with the criteria set forth

in the precepts.  See Report of Investigation, at 89–90 (Declaration of selection board member

Susan Alexander); id. at 94–95 (Declaration of selection board member Christopher Murray); id.

at 99 (Declaration of selection board member Marian Williams); id. at 109–10 (Declaration of

selection board member David Donahue); <u>id.</u> at 114–15 (Declaration of selection board member Geeta Pasi). The Department has also presented evidence that Figueroa's application was ultimately mid-ranked. <u>See</u> Def.'s Reply Ex. 3, at DOS000709, DOS000786. Combined, the affidavits and the ultimate result support the conclusion that Figueroa's application was reviewed in accordance with the precepts and he was not ranked highly enough to be promoted.

Figueroa urges the Court to ignore the affidavits from the selection board members because they do not recall his application specifically and because the affidavits are "self-serving." This argument misses the mark. For one, the fact that the reviewers do not remember Figueroa's application is not enough to discredit their sworn testimony that they reviewed each of the applications under the precepts; failing to remember a particular application is not inconsistent with having actually reviewed it. Nor is it particularly surprising that the reviewers might not remember Figueroa in particular given that they reviewed over 400 applications. Only one of the reviewers had ever met Figueroa, and none of them had a close relationship with him. Report of Investigation at 89 (Declaration of selection board member Susan Alexander); <u>id.</u> at 91–92 (Declaration of selection board member Christopher Murray); <u>id.</u> at 97 (Declaration of selection board member Marian Williams); <u>id.</u> at 101 (Declaration of selection board member Constance Philpot); <u>id.</u> at 104 (Declaration of selection board member Peter Barlerin); <u>id.</u> at 107 (Declaration of selection board member David Donahue); <u>id.</u> at 113–14 (Declaration of selection board member Geeta Pasi). As such, there is no apparent reason why Figueroa's application would be especially likely to stand out to the reviewers compared to those of other qualified applicants. Thus, the declarants' failure to remember Figueroa does not render their declarations suspect.

The allegedly "self-serving" nature of the affidavits also does not require the Court to discredit them. "[E]vidence a party proffers in support of its cause will usually, in some sense, be 'self-serving.'" Johnson v. Perez, 823 F.3d 701, 710 (D.C. Cir. 2016). But such testimony is to be discredited only if it has been undermined "either by other credible evidence, physical impossibility[,] or other persuasive evidence that the [affiant] has committed perjury." Chenari v. George Washington Univ., 847 F.3d 740, 747 (D.C. Cir. 2017) (citation omitted). Figueroa points to no such evidence here. And the affidavits are not so wholly conclusory as to be disregarded, either: the affiants offer specific facts concerning the review process they undertook—a subject within their personal experience and competence to testify about—not just legal conclusions or generalities. For these reasons, the affidavits are properly considered for purposes of summary judgment.

Figueroa next argues that the Department's rationale is inadequate because it has provided "shifting" reasoning for his non-promotion. But the Department's rationale has been consistent throughout this litigation: it did not promote Figueroa because he was not ranked highly enough by the selection boards following the criteria and process laid out in the precepts. According to the Final Agency Decision, the Department's proffered reason was that it "applied the same criteria to consideration of [Figueroa's] promotion candidacy that it applied to all others." Def.'s Reply Ex. 1, at 14. Similarly, the decision by the EEOC states that the Department "articulated legitimate, nondiscriminatory reasons for its actions," namely that "it applied the same criteria to consideration of [Figueroa's] promotion candidacy that it applied to all others" and Figueroa was not recommended for promotion. Compl. Ex. 2, at 2. And before this Court, the Department maintains this explanation for why Figueroa was not promoted. Def.'s MSJ at 9. Thus, the Department's story has been consistent throughout.

Finally, Figueroa contends that the Department's explanation is not sufficiently "clear and reasonably specific" to constitute a legitimate, nondiscriminatory reason, as required by the Supreme Court's ruling in <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 258 (1981).  Pl's MSJ at 18–21; Pl's Reply Supp. Cross-Mot. Summ. J. at 6–8.  This requirement "arises both from the necessity of rebutting the inference of discrimination arising from the prima facie case and from the requirement that the plaintiff be afforded 'a full and fair opportunity' to demonstrate pretext."  <u>Id.</u>; <u>see also</u> <u>Oates v. District of Columbia</u>, 824 F.2d 87, 91 (D.C. Cir. 1987).  As explained by the First Circuit decision that <u>Burdine</u> cited approvingly, "a plaintiff cannot be expected to disprove a defendant's reasons unless they have been articulated with some specificity."  <u>Loeb v. Textron, Inc.</u> 600 F.2d 1003, 1011 n.5 (1st Cir. 1979).  When an employer presents a "bald and amorphous" reason—such as that the employee was not "sufficiently suited" for a position—"neither [the Court] nor [the plaintiff] can identify the kind of evidence needed to demonstrate that such a rank generalization is or is not pretextual."  <u>Patrick v. Ridge</u>, 394 F.3d 311, 317 (5th Cir. 2004).

The rationale that the Department has presented here meets this specificity requirement. While Figueroa contends that the reason is just a vague "not qualified enough" excuse, that is not an accurate characterization of the Department's position.  The Department explains that the reviewing boards followed the process outlined in the precepts and did not rank Figueroa's application highly enough.  The process followed by the selection boards is outlined in detail in the precepts.  <u>See</u> Report of Investigation at 117–97 (precepts documents).  This level of detail extends to the criteria used by the selection boards in evaluating employees eligible for promotion:  the precepts list six core criteria, with specific skills detailed for each criteria along with descriptions of what the mastery of those skills at the low-, mid-, and senior-level looks

like.  See id. at 118–26.  And these same six core precepts are used in the annual employee

reviews that the selection board received and used to evaluate employees for promotion.  See id.

at 205, 210, 216 (Figueroa's evaluations).  Thus, the Department's proffered reason is fairly

characterized as saying that Figueroa was not ranked highly enough compared to other eligible

employees based on an evaluation under the six precepts (including the specific descriptions for

each precept).

The Department's reason here is thus specific enough because a plaintiff—and the

Court—can clearly see what type of evidence would be needed to demonstrate that the reason is

pretext.  Namely, a plaintiff could bring forth evidence that, given the articulation of the six

precepts the Department has laid out, she clearly meets those requirements based on her prior

experience.  And the plaintiff can compare her prior experience and achievements to those

employees who were eventually promoted using the Department's precepts and their fleshed out

descriptions as a guide.  Since the same six precepts are used to evaluate employees annually, the

employee can easily find a discussion of how she meets—or how those selected do not meet—

these six criteria in her annual evaluations and can use these reviews as a basis for a comparison.

Indeed, this is precisely what Figueroa contends—he argues in his opposition that his annual

reviews and achievements show he is well qualified under the precepts' criteria.  Pl.'s MSJ at

19–20.

The cases that Figueroa cites in support of his argument demonstrate why the

Department's reason is sufficiently concrete here.  For instance, in Patrick, the employer asserted

that the plaintiff "was not 'sufficiently suited'" for the position, but "gave no explanation of what

this means."  394 F.3d at 316.  The interviewers who analyzed the applicants were simply told to

rate the six finalists for the position based on "each candidate's strengths," "how each responded

to a uniform set of questions," and "how the panel members believed that each would fit into the work group." Id. at 314. Similarly, in Grier v. Secretary of the Navy, 677 F. Supp. 362 (E.D. Penn. 1987), the employer asserted that the plaintiff was not "highly qualified" but provided no evidence of the criteria used to rank the individuals or to make the promotion decision. Id. at 367. And in Alvarado v. Texas Rangers, 492 F.3d 605 (5th Cir. 2007), the interview board was simply instructed to rank each candidate "with the 'objective being to identify those who are the best qualified and to distinguish them by the rating' given." Id. at 610. There is no indication that the reviewers in Alvarado were given any criteria on which to base their determination of whether an employee was "qualified."

In each of these cases, the employer asserted that the plaintiff was not the "most qualified" without providing any indication of *what qualifications* it was looking for. In other words, the employer never provided any guidance as to what a "most qualified" or "most suited" candidate would look like. Without a sense of the particular criteria that the plaintiff failed to meet, a plaintiff cannot attempt to show pretext by demonstrating how she does, in fact, measure up to or even exceed the employee selected over her. Moreover, without an articulation of what qualifications matter, a Court cannot be certain whether the plaintiff was deemed less qualified because she failed to meet some specific criteria or because of her gender or race. See Alvarado, 492 F.3d at 617. But here, because the Department has provided the specific criteria used to evaluate employees—the six precepts—Figueroa can challenge the assertion that he failed to measure up to these specific criteria and the Court can assess whether the Department's proffered

explanation may be pretext.  Accordingly, the Department has presented a sufficiently clear and reasonably specific legitimate, nondiscriminatory reason for Figueroa's non-promotion.[3]

### 2. *Figueroa's evidence of pretext*

Since the Department has proffered a legitimate, nondiscriminatory reason for his non-promotion, the burden shifts to Figueroa to provide sufficient evidence by which a reasonable jury could find the Department's stated reason was pretext for racial discrimination.  None of the arguments he makes suffices to carry that burden.

*First*, Figueroa contends that a heightened burden applies because the Department "has been found to be a 'discriminator.'"  Pl.'s MSJ at 22.  Citing the D.C. Circuit's decision in Bundy v. Jackson, 641 F.2d 934 (D.C. Cir. 1981), he insists that because of the history of discrimination at the Department, the Department must rebut a *prima facie* case by clear and convincing evidence.

--------

[3] Relying on Alvarado, Figueroa also argues that the employer must provide specific reasons why *he* was less qualified in order to proffer a sufficiently clear and reasonably specific reason.  See Pl.'s MSJ at 19 (citing Alvarado, 492 F.3d at 617–18).  Put another way, Figueroa appears to contend that an employer must say that the employee was less qualified for a specific reason for that employer to meet its burden.  But he points to no case law from the D.C. Circuit imposing such a requirement.  Nor is it apparent that Alvarado even imposes such a burden.  Rather, Alvarado requires the defendant to provide a *specific basis* for its subjective determination that the plaintiff was less qualified.  Pointing to detailed criteria used to evaluate employees for promotion decisions—as the Department does here—is certainly providing a *basis* for the conclusion that Figueroa was less qualified.  Cf. Alvarado, 492 F.3d at 617 (noting that the employer "offered neither an explanation nor evidence of how or why the interviewers arrived at th[e] scores" assigned to the applicants).  In any event, requiring such a particularized, individualized reason would impose a significant burden on large employers, like the Department, that review hundreds of eligible employees when making promotion decisions.  Since the Department's reason serves the purposes of the "clear and reasonably specific" requirement—allowing a plaintiff a fair chance to show pretext—the Court is not inclined to obligate the Department to provide an employee-specific reason, even if it might have been helpful for it to have done so in this situation.

But Bundy and similar cases are inapposite here. The D.C. Circuit concluded that the plaintiff in Bundy carried a lower than usual burden of proof on her back pay and failure to promote claims because she had already proven that she had personally been subjected to a hostile work environment. 641 F.2d at 952; see also Day v. Mathews, 530 F.2d 1083, 1084 (D.C. Cir. 1976) (applying heightened burden on defendant to rebut prima facie case in failure to promote claim where plaintiff had already proven other forms of workplace discrimination). In cases involving a prior finding of discrimination, the court of appeals has reasoned that "it is now impossible for an individual discriminatee to recreate the past with exactitude" and thus to show that, but for the discriminatory animus, she would have received the promotion. Day, 530 F.2d at 1086 (citation omitted); see also Bundy, 641 F.2d at 952 ("[T]he employer's own proved discriminatory actions were largely responsible for the plaintiff's typical dilemma of having to prove the motive underlying the employer's past action. . .").

The key in both Bundy and Day was that the plaintiff had already proven himself or herself to be the victim of discrimination by that employer on an independent claim other than failure to promote. See Bundy, 641 F.2d at 953 (plaintiff had proven she was the victim of a pattern or practice of sexual harassment); Day, 530 F.2d at 1084 (plaintiff had proven that he was "improperly denied rating points for certain awards" because of his race). Figueroa has made no such prior showing that he is "a victim of illegal discrimination as a matter wholly independent of [his] claim for back pay and promotion," Bundy, 641 F.2d at 952. As such, the heightened burden required by Bundy and Day does not apply here.

*Second*, Figueroa attempts to demonstrate pretext by arguing that he was clearly qualified for the position. He insists that "no other FS-02 Political Officer candidate promoted by the 2008 Boards could match Plaintiff's leadership and readiness for higher responsibilities" given

his "combination of accomplishments." Pl.'s MSJ at 19. While the Court has no reason to doubt Figueroa's experience or accomplishments, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Hairston, 773 F.3d at 273 (citation omitted). Where, as here, "an employer says it made a hiring or promotion decision based on the relative qualifications of the candidates, a plaintiff can directly challenge that qualifications-based explanation only if the plaintiff was '*significantly* better qualified for the job' than those ultimately chosen." Adeyemi, 525 F.3d at 1227 (citation omitted). After all, courts should be hesitant to second-guess the employment decisions of employers and to "render the judiciary a super-personnel decision that reexamines any entity's business decisions." Id. (citation omitted).

But Figueroa presents no evidence that he was significantly better qualified than those selected—or, indeed, *any* evidence concerning the relative qualifications of those who were promoted over him. Nor does the fact that Figueroa was ranked for promotion in 2004 and 2005 indicate he was significantly better than those promoted in 2008. Given that the candidates are re-evaluated on an annual basis, it is entirely plausible that Figueroa was ranked more highly against the talent pool in 2004 and 2005 than he was against a completely different pool in 2008. There is no evidence in the record to indicate that the quality of applicants in 2004 and 2005 was equal to or greater than in 2008, a necessary first step to raise an inference that Figueroa was better qualified than those selected for promotion in 2008. Thus, Figueroa's contention that he was qualified for the job is insufficient by itself to carry his burden to show pretext.

*Third*, Figueroa points to statistics showing that, in 2008, Hispanics were promoted at a lower rate than other applicants, as well as other evidence that he argues demonstrates systematic discrimination against Hispanics at the Department. Pl.'s MSJ at 26–27; see also Def.'s MSJ Ex. F, at DOS001043 (statistics). But such evidence "is less significant because the ultimate issue is

whether the *particular* plaintiff was the victim of an illegitimately motivated employment decision." Krodel v. Young, 748 F.2d 701, 710 (D.C. Cir. 1984); see also Hairston, 773 F.3d at 274–75. While statistics or other evidence of systematic discrimination can be "*relevant* to a showing of pretext in disparate treatment actions," Krodel, 748 F.2d at 710, by themselves they are not sufficient here to provide reasonable evidence by which a jury could conclude the stated reason for Figueroa's non-promotion was pretext. That is so particularly given the limitations on the statistics Figueroa cites, as discussed in more detail below.

*Finally*, Figueroa argues that he is entitled to a negative spoliation inference because the reviewing boards destroyed their notes following the 2008 selection process, consistent with Department procedure at the time. When a party destroys relevant evidence that it has an obligation to maintain, the opposing party may be entitled to a negative inference. See, e.g., Grosdidier v. Broad. Bd. of Governors, 709 F.3d 19, 27 (D.C. Cir. 2013); Talavera v. Shah, 638 F.3d 303, 312 (D.C. Cir. 2011).

As an initial matter, Figueroa points to no evidence that any notes to be destroyed ever existed in the first place. None of the declarations filed by the selection board members discuss keeping or making notes. See Report of Investigation at 88–116. The simple fact that the Department's policy was for selection board members to discard their notes says nothing about whether such notes were kept to begin with.

And what evidence there is in the record tends to suggest that notes may never have existed in the first place. One of the board members in fact stated that "[t]he Board members did not keep any records" and "were told we may not do so." Id. at 114 (Declaration of selection board member Geeta Pasi). Similarly, Claire Pierangelo—a Department of State employee who served on selection boards in other years—testified that when she served on selection boards, she

did not take notes on applications that were mid-ranked, but rather "only took notes on those that [she] moved either to the low ranking or to the promotable piles." Def.'s Reply Ex. 2, at 115:10–22. She further testified that "in general what most board members do is they make a marking that consists of a P for promote, L for low rank, or M for mid rank. So the extent of any . . . notes from most board members would be a simple indication of which pile they think [an employee] should belong in." Id. at 51:7–12. Pierangelo's testimony further suggests that there would be few, if any, notes to be found. Thus, Figueroa fails to provide sufficient evidence for the Court to conclude that there even *were* any substantive notes to begin with. Without that, it is hard for the Court to conclude that the Department in fact destroyed the relevant notes.[4]

Even assuming that there were notes and those notes were destroyed, a spoliation inference requires that the Department destroyed the notes in violation of an obligation to retain them. See, e.g., Zhi Chien v. District of Columbia, 839 F. Supp. 2d 7, 13 (D.D.C. 2011) (requiring a party to show that "the party having control over the evidence had an obligation to preserve it when it was destroyed or altered" to obtain a negative inference from spoliation (citation omitted)). The Department argues that no such obligation existed at the time any notes were destroyed.

As an initial matter, the Department was not involved in litigation with Figueroa or reasonably on notice of prospective litigation at the time any notes were destroyed. The reviewing boards concluded their review and transmitted the results by July 8, 2008. See Def.'s

---

[4] In contrast, in the cases that Figueroa cites, there was clear evidence that notes *were taken* and then destroyed. See Grosdidier, 709 F.3d at 22 ("Although all of the panelists took notes during the interviews, only Butts preserved her notes."); Talavera, 638 F.3d at 312 ("Streufert admits to knowing or negligent destruction of his interview notes insofar as the destruction was not accidental.").

Reply Ex. C, at DOS000696 (cable transmitting the results of the boards' review). Figueroa filed his complaint with the Department's Civil Rights Office—which would have placed the Department on notice of possible litigation—in October 2008, several months later. Thus, the ordinary obligation to retain potentially relevant evidence during the pendency or in reasonable anticipation of litigation was absent in July 2008 when the notes, if they existed, might have been destroyed.

Figueroa contends that the destruction of the notes nonetheless violated an obligation to retain them, pointing first to a regulation by the Office of Personnel Management, 5 C.F.R. § 335.103(b)(5), which requires federal agencies to "maintain a temporary record of each promotion" for at least two years. But this regulation is part of those that govern the process of promotion within the *civil* service. See id. § 335.103(a) (section applies to promotions made under authority of section 335.102); id. § 335.102 (discussing agency authority to promote career, civil service employees). Figueroa was a member of the *Foreign* Service, not the civil service. Promotion within the Foreign Service falls under an entirely different statutory scheme. See, e.g., 22 U.S.C. §§ 3905, 4002. Thus, in contrast to Talavera— where the federal agency in fact admitted it was governed by this regulation, see 638 F.3d at 312—the Department's procedure does not violate the Office of Personnel Management's record-retention regulation.

Figueroa also contends that the destruction would have violated an EEOC regulation, 29 C.F.R. § 1602.14, which requires that an "employer" retain any "personnel or employment record[s]" for at least one year. As Figueroa correctly notes, the D.C. Circuit applied this regulation to the defendant federal agencies in Talavera and Grosdidier. The Department— unlike the federal agencies in Talavera and Grosdidier—argues that this regulation is inapplicable because under the statutory text of Title VII, the government is not an "employer"

and so any recordkeeping obligations for "employers" would not apply. See 42 U.S.C. § 2000e(b) ("The term 'employer' . . . does not include the United States . . ."); id. § 2000e-8(c) (requiring "[e]very employer . . . subject to" Title VII to make, keep, and preserve relevant records pursuant to EEOC regulations).

Neither the D.C. Circuit nor any other court in this District appears to have squarely addressed this latter argument. The Court need not resolve it either. Even if the Court agreed that (1) there were notes that were destroyed and (2) that destruction was contrary to an obligation to retain the records, any negative inference to be drawn from the destroyed notes is still insufficient for Figueroa to meet his burden. After all, "even if a factfinder could reasonably infer that the destroyed notes contained information that might be favorable to [Figueroa], favorable evidence is not in all instances equivalent to evidence that would permit [him] to survive summary judgment." Grosdidier, 709 F.3d at 28. Given Pierangelo's testimony that the notes were unlikely to reveal much more than whether the panelists thought Figueroa ought to be ranked high, mid, or low—and the final listing of eligible employees signed by each board member already conclusively shows that Figueroa was ultimately mid-ranked by the boards, see generally Def.'s Reply Ex. C—it is highly unlikely that the notes would have contained the sort of subjective comments or feedback that might have constituted evidence which by itself raises a reasonable inference of pretext. Cf. Grosdidier, 709 F.3d at 28–29. Thus, Figueroa fails to carry his burden to show pretext.

### 3. Conclusion

Ultimately, the Department has presented a legitimate, nondiscriminatory reason for Figueroa's non-promotion: he was not ranked highly enough by the selection board to be promoted. The question is then whether Figueroa has presented sufficient evidence by which a

jury could find that this reason is pretext.  Because Figueroa has failed to do so, for the reasons

explained above, he cannot carry his burden.  The Department is therefore entitled to summary

judgment on Figueroa's disparate treatment claim.

B.  Disparate Impact

Moving to Figueroa's disparate treatment claim:  In order to meet his initial burden,

Figueroa "must offer statistical evidence of a kind and degree sufficient to show that the practice

in question has caused the exclusion of applicants for jobs or promotions because of their

membership in a protected group."  Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994

(1988).[5]  Because Figueroa has failed to meet this burden, summary judgment is appropriate for

the Department on his disparate impact claim.

Figueroa's argument primarily rests on statistics showing the results of the FS-02 to FS-

01 promotions during the five-year period from 2004 through 2008.  See Def.'s MSJ Ex. F, at

DOS001043.  Yet Figueroa provides no analysis of these statistics, instead relying on the bare

promotion figures without any indication of the statistical significance of any demonstrated

discrepancies reflected in them.  This approach differs from most cases, where the plaintiff

presents expert testimony or other evidence explaining the statistical significance of the

numerical data provided, see, e.g., Anderson, 180 F.3d at 339–40 (referencing plaintiff's

evidence that disparities in pay data exceeded 1.96 standard deviations under a two-tailed test of

statistical significance).

---

[5] Figueroa appears to challenge a number of purported personnel practices, including the "fresh look" the selection boards take each year and the Department's failure to give Hispanics leadership positions that would facilitate their promotion.  The Department argues that Figueroa did not raise some of these challenged practices in his administrative complaint and thus cannot raise them here.  The Court need not resolve this dispute, since it finds that Figueroa fails to meet his burden regardless of which practice is considered.

Figueroa's statistics certainly show that fewer Hispanic employees were promoted—indeed, none in 2006, 2007, and 2008—than white applicants or, at times, other minority applicants. But it is settled that "statistics that 'indicate nothing more than an under-representation [of a protected class]' cannot alone create a triable issue of fact." Bolden, 847 F. Supp. 2d at 35 (citation omitted). In light of the smaller number of eligible Hispanic employees compared to eligible white employees, Figueroa must show that the promotion process has a *disproportionate* impact on Hispanic applicants. See, e.g., Aliotta v. Bair, 614 F.3d 556, 565 (D.C. Cir. 2010).

Figueroa's statistics, on their face, do not present such a striking and consistent discrepancy between white and Hispanic employees to give rise to a fair inference that the promotion selection process has a disproportionate impact on Hispanic employees. For one, the rates of promotion for Hispanic employees fluctuated during the five-year period from 2004 through 2008.[6] In fact, Hispanics had the highest promotion rate in 2005 and the second-highest in 2004, exceeding the promotion rates of white employees both years. Def.'s MSJ Ex. F, at DOS001043 (Hispanic employees had promotion rates of 29.4% in 2004 and 33.3% in 2005 compared to promotion rates of 15.9% and 14.2% for white applicants). The fact that Hispanics are not *consistently* promoted at a lower rate than other groups of employees—absent any change during the relevant time period—cuts against the conclusion that they are disproportionately affected by the particular method of promotion decision-making that the Department employs. See Valentino v. U.S. Postal Serv., 674 F.2d 56, 70 (D.C. Cir. 1982) (holding that statistics that

---

[6] While Figueroa focuses on the results from 2006-2008, he provides no reason why the Court should ignore the results in 2004 and 2005 given that they are the result of the same process of reviewing and making promotion determinations as in the later years.

"did not demonstrate that women received grade increases less often than men as a regular occurrence" failed to establish disparate impact).

There are similar fluctuations in promotion rates for other minority applicant groups from 2004–2008: African American applicants were promoted from FS-02 to FS-01 at rates varying from 0% to 25% and Asian Americans ranging from 7.7% to 40%. Def.'s MSJ Ex. F, at DOS001043.[7] Figueroa provides no evidence why the fluctuations for Hispanic employees are different from or more significant than those experienced by other applicant groups that also had small numbers of eligible employees. And while the promotion rate for white applicants shows no such marked fluctuations, it consistently hovered near the overall promotion rate. See id. (showing a 15.9% promotion rate for white applicants in 2004 compared to a 17.2% overall rate, a 14.2% rate in 2005 compared to a 15.2% overall rate, a 17.6% rate in 2006 compared to a 17.6% overall rate, a 14.0% rate in 2007 compared to a 14.1% overall rate, and a 17.6% rate in 2008 compared to a 16.9% overall rate). Given that white applicants were not being promoted at a disproportionate rate, it seems more likely that the variation in promotion rates among minority employees reflects random variation and the small number of eligible minority employees.

Finally, stepping back, during the entire 2004-2008 time period, 13.70% of eligible Hispanic employees were promoted from FS-02 to FS-01, a number not far from the overall promotion rate of 16.2%, the 15.92% promotion rate for white applicants, and the 16.67%

---

[7] While the statistics show the promotion rates of Native American employees as well, only one or two such eligible employees are reported for every year. As such, it is hard to draw any real comparison between any fluctuations in the promotion rates of Native American employees and those of other employees.

promotion rate for African American applicants. See Def.'s MSJ Ex. F, at DOS001043.[8] Again, these differences are not so potent as to, on their face, suggest that the Department's method of making promotion decisions at that time had a disproportionately negative impact on Hispanic employees.[9]

Even if the statistics showed the sort of disproportionate impact required, Figueroa provides no evidence that such impact was caused by a *particular* practice—and it is his burden to do so, see Garcia v. Johanns, 444 F.3d 625, 635 (D.C. Cir. 2006) ("It does not suffice . . . to show an ethnic imbalance in the USDA's award of loans to farmers; rather, the [plaintiffs] must show that a common facially neutral policy *caused* the imbalance." (emphasis added)). As the D.C. Circuit has explained, there are multiple causes for a disparity in promotion or hiring. To be sure, it "may be a product of an unlawful discriminatory animus." Palmer v. Shultz, 815 F.2d 84, 90 (D.C. Cir. 1987). But a disparity can also "have a legitimate and nondiscriminatory cause," including mere "chance." Id. at 91. After all, it is certainly possible that "even if selections were made entirely on the basis of qualification, without a trace of discriminatory bias, random deviations in the selection rates for [different races] may result." Id.; see also Frazier v.

---

[8] Asian employees had a 23.73% promotion rate through that time period, and ultimately Native American employees had a 14.29% promotion rate (1 out of 7). See Def.'s MSJ Ex. F, at DOS001043.

[9] As an added wrinkle, given the nature of the promotion process, it is likely the case that the total number of eligible employees reflected in these statistics (1333 over the five years) does not represent the total number of *distinct* employees considered for promotion during this time period. Employees, after all, could be reconsidered multiple years. Figueroa provides no statistics on the *distinct* number of Hispanic (or other) employees eligible over the five year period compared to the total number promoted, nor any analysis of how this dynamic might impact the significance of any numerical differences in annual promotion rates. The Court has calculated promotion rates using the total number of eligible employees listed in the statistics provided by the parties since that is all it has.

28

<u>Consol. Rail Corp.</u>, 851 F.2d 1447, 1452 (D.C. Cir. 1988) ("There is always some possibility that a statistical discrepancy is due to chance.").

Given this fact, plaintiffs in disparate impact cases typically provide some statistical analysis of their data to discount the likelihood that the disparities shown are the consequence of random variation rather than unlawful animus. <u>See, e.g.</u>, <u>Hill v. Ross</u>, 183 F.3d 586, 591 (7th Cir. 1999) ("Fairly simple statistical inquiries can reveal the probability that a circumstance less whole than chance [is] to blame."); <u>Palmer</u>, 815 F.2d at 91 ("A statistical analysis of a disparity in selection rates can reveal the *probability* that the disparity is merely a random deviation from perfectly equal selection rates."). Figueroa provides no such analysis here. As a result, the Court has no basis on which to assess whether any disparity in Hispanic promotion rates may be caused by the challenged processes rather than the randomness of chance, the overall small number of Hispanic applicants, or some other factor. Without such evidence of a causal link—or even an indication of a disproportionate impact on Hispanic applicants—Figueroa fails to meet his burden to make a prima facie case of disparate impact. Summary judgment in favor of the Department is thus appropriate on Figueroa's disparate impact claim as well.

## IV. Conclusion

Nothing in this opinion is intended to minimize the importance of ensuring diversity in the ranks of the Foreign Service or to assess the State Department's efforts to rectify its past deficiencies in achieving it. Nor is this ruling intended to call into question Mr. Figueroa's notable accomplishments and qualifications. Rather, based on the evidence presented, the Court simply concludes that Figueroa has failed to meet his burden to survive summary judgment on either a disparate treatment or disparate impact claim of racial discrimination. For this reason alone, the Department is entitled to summary judgment on all counts.

The Court will, accordingly, grant the Department's Motion for Summary Judgment and deny Figueroa's Cross-Motion for Summary Judgment.  A separate Order will accompany this Memorandum Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>January 31, 2018</u>